**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0461-23

KHUBANI ENTERPRISES, INC.,
a New Jersey Corporation,

     Plaintiff-Respondent,

v.

NORTH JERSEY PHYSICAL
THERAPY & WELLNESS
CENTER, LLC, NORTH
JERSEY ORTHOPAEDIC
AND SPORTS MEDICINE
INSTITUTE LLC, and
MICHAEL C. RUSSONELLA,

     Defendants-Appellants,

and

EDGE PHYSICAL THERAPY
AND SPORTS MEDICINE, LLC,

     Defendant.

_____

Submitted December 16, 2024 – Decided May 6, 2025

Before Judges Gummer, Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0070-21.

Fernando Iamurri, PC, attorneys for appellants (Fernando Iamurri, on the briefs).

Martin David Katz, attorney for respondent.

PER CURIAM

In this commercial-lease dispute, the trial court granted plaintiff's motion for a directed verdict after the close of all evidence and entered judgment in favor of plaintiff against defendants for their breaches of contract and nonpayment of rent. We affirm that judgment.

I.

On December 1, 2019, defendants North Jersey Physical Therapy & Wellness Center, LLC (Wellness) and North Jersey Orthopaedic and Sports Medicine Institute, LLC (Sports Medicine) respectively entered into nearly-identical lease agreements with plaintiff for office space located in Clifton. The leases were personally guaranteed by defendant Michael C. Russonella, M.D. (Russonella), an orthopedic surgeon and the single member of Wellness and Sports Medicine. Throughout the terms of the leases, defendants occupied the space but failed to make most of the monthly rent payments. Plaintiff filed a complaint against defendants, Wellness, Sports Medicine, and Russonella, for

2

nonpayment of rent. Defendants filed an answer to the complaint, denying the allegations and asserting seventeen separate affirmative defenses.

At trial, the only exhibits submitted by defendants for admission into evidence were copies of Executive Order No. 107 and Executive Order No. 242 related to COVID-19 closures and the Coronavirus Aid, Relief, and Economic Security Act, of which the trial court took judicial notice pursuant to N.J.R.E. 201(a). See Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020); Exec Order No. 242 (May 24, 2021), 53 N.J.R. 1044(a) (June 21, 2021); Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 2206, 134 Stat. 281, 346-47 (2020).

The Wellness lease required a monthly payment of $5,735.96, reflecting base rent and utilities, payable on the first of each month during the sixty-six-month lease period ending on September 30, 2025. The Wellness lease term start date was December 1, 2019, but the "Rent Commencement Date" was April 1, 2020. The lease also stated, "[t]enant agrees to pay as additional rent, all attorneys' fees and other expenses incurred by the [l]andlord in enforcing any of the obligations under this lease."

The leases dictated that a late rent payment would be subject to a "Late Charge":

> Lessee shall pay a "Late Charge" of five (5%) percent of any installment of Fixed Basic Rent or Additional Rent due paid more than five (5) days after the due date thereof, to cover the extra expense involved in handling delinquent payments. The Late Charges are Additional Rent. The amount of the Late Charge to be paid by Lessee shall be reassessed and added to Lessee's obligations for each successive monthly period until paid.

The addendum to the leases indicated that the landlord "shall have no responsibility for any "[w]ork or [f]it [u]p to be performed" on the rental property and allocated the responsibility for such work to the tenant. The leases further required in paragraph 19 that all notices or demands from the tenant to the landlord be in writing and sent by certified mail.

At trial, Azad Khubani, plaintiff's General Manager and Chief Executive Officer, testified that from December 1, 2019, to April 1, 2020, no rent was due under the lease agreements. During this time, and extending after the Rent Commencement date, defendants performed a "fit-up" on both premises, performing structural and interior work to their rented spaces to "get [them] ready to open up [the] business."

Khubani further testified that defendants had failed to pay rent throughout the terms of the leases. He specifically testified to amounts owed by defendants at the time of trial, which included the base rent, utilities, late charges, and

4

damages, as well as a $200 carpet cleaning fee on the Wellness lease. Evidence produced at trial showed that on the Wellness lease, defendant Wellness had paid a security deposit in the amount of $11,017.24 and made seven payments of $2,845.69 from August 2020 through February 2021 that were credited to defendant's account as "partial rent" payments. On the Sports Medicine lease, defendant Sports Medicine paid a security deposit in the amount of $11,382.76, first-month's rent and utilities in the amount of $5,691.38, and a lump sum of $11,200 on February 4, 2020, which covered rent payments through June 2020. Defendant Sports Medicine then made three additional monthly rent and utility payments and six partial monthly rent and utility payments on its lease through January 1, 2021. Khubani testified that at the time of trial Sports Medicine owed $487,093.03 on its lease and Wellness owed $691,608.04 on its lease. Khubani testified plaintiff was not seeking common-area maintenance charges as part of its complaint. Khubani testified that he had never received notice from defendants regarding any issues with the premises.

Khubani testified that on September 1, 2020, he had sent a letter to Russonella stating that the total balance owed for both properties as of that date was $46,537.39. The letter further indicated that it had been sent in accordance

5

with the lease agreements and was meant to "serve as Notice of [defendants'] Default."

Additionally, on November 18, 2021, Khubani sent an email to Russonella attaching a statement balance regarding both leases as of December 2021. Russonella responded, "Get lost!" in an email admitted in evidence.

Russonella testified that after signing the leases, "fit-ups" or improvements to electrical and HVAC systems were not complete until July 2020 when both businesses moved into their respective units. After fit-up work was completed, his businesses faced various obstacles as a result of the COVID-19 pandemic, which began in March 2020. He testified that Wellness was open from July 2020 through August 2020 and then had to shut down because of declining business he attributed to the pandemic. At that time, Russonella worked "through attorney communications" to attempt to "rework[] or restructure[e] the lease . . . because there was no way to keep making that payment with no income coming in." He testified that Sports Medicine was "minimized" as a result of the pandemic but did not shut down.

Russonella further testified that he had made partial rent payments during the lease terms, including throughout the pandemic. According to Russonella, he ceased payments after requesting a renegotiation due to the pandemic and

A-0461-23

because "the building had inadequacies that were not being addressed" and "[his] business was taking a significant decline." Russonella asserted that from the time the lease terms began, the elevators were not completely functioning, both premises experienced air conditioning and heating issues, water damage to ceiling tiles required constant maintenance, and power outages caused periods of daily shutdowns of devices and equipment in both offices. Though he had concerns with the building, Russonella conceded he had not provided the landlord with written notices of those concerns as required under the leases.

Finally, Russonella asserted the late charges were unreasonable and defendants were never offered an opportunity to pay the delinquent rent and utilities without the obligation to pay late charges as a condition.

Plaintiff moved for a directed verdict at the close of all evidence, which the court granted, finding that "there [was] nothing for the [j]ury to decide in this case." In particular, the court addressed defendants' affirmative defenses, finding a failure to prove any of them. The court found unconscionability did not apply because "the late charges are additional rent" pursuant to the clear language of the leases and defendants had provided "no testimony in this case that the State of New Jersey prohibits these types of late charges as unconscionable." The court also found the impossibility argument lacked merit,

7

noting defendants' offices were never required to be closed by executive order or the CARES Act during the pandemic, the practices had remained open, and nothing precluded them from conducting business, except the absence of customers attributable to the businesses' recent launch.  In all, the court based its decision on the plain language in the contracts that disposed of all issues as questions of law and the lack of any evidence to constitute a factual dispute.  After extended colloquy, the court ruled defendants had failed to present evidence on the issue of impossibility.

On September 19, 2023, the trial court entered judgment in favor of plaintiff against Wellness and Russonella in the amount of $691,608.04 and against Sports Medicine and Russonella in the amount of $487,093.03, where both amounts included Late Charges for late rent, as well as court costs in an amount to be determined by the clerk of court.

On appeal, defendants claim the trial court erred in granting a directed verdict at the close of all evidence because the jury should have been allowed to decide whether plaintiff materially breached the lease, thereby relieving defendants of their performance obligations.  They claim the jury should have also decided whether the defenses of impracticability or impossibility applied based on the evidence presented.  They contend that the Late Charges should

A-0461-23

not have been included in the judgment because they were imposed in a punitive and unreasonable manner and that the jury — not the court — should have determined whether those charges were appropriate, consistent with the lease terms, or excessive. Accordingly, defendants urge this court to vacate the directed verdict, deem the Late Charges unreasonable, and remand for a jury to resolve the purported factual disputes regarding whether plaintiff had breached the lease, whether this was merely a failure-to-pay situation in which late fees were inappropriate, and whether those fees were unjustly imposed.

## II.

The standard applicable to a motion for a directed verdict is equivalent to that applicable to one for summary judgment. Frugis v. Bracigliano, 177 N.J. 250, 269-70 (2003); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:40-2 (2025). ("The standard for determining both a motion for judgment under R. 4:40-1 and under a motion for judgment notwithstanding the verdict under R. 4:40-2 is the same as that governing the determination of a motion for involuntary dismissal under R. 4:37-2(b)"). The trial court must accept as true all evidence that supports the non-moving party's position and all favorable legitimate inferences therefrom to determine whether the non-moving party is entitled to judgment as a matter of law. Friedman v. Martinez, 242 N.J.

450, 472 (2020); Est. of Narleski v. Gomes, 244 N.J. 199, 205 (2020). The court must deny the motion so long as "reasonable minds could differ," Johnson v. Salem Corp., 97 N.J. 78, 92 (1984), to ensure that any legitimate disputes of material fact be left to the jury. Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998). The same standard applies on appeal. Samolyk v. Berthe, 251 N.J. 73 (2022); Stewart v. N.J. Tpk. Auth./Garden State Parkway, 249 N.J. 642, 655 (2022).

When reviewing the grant of a directed verdict, we do so de novo. Our review accords no special deference to a trial court's assessment of the documentary record because it does not turn on a trial court's determinations of credibility but instead on questions of law. See Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 278 (1995) (noting that no "special deference" applies to a trial court's legal determinations). We accept as true all evidence that supports the non-moving party's position and all favorable inferences therefrom. Akhtar v. JDN Props. at Florham Park, LLC, 439 N.J. Super. 391, 402-03 (App. Div. 2015).

In particular, when a contract is at issue, we apply familiar rules of contract interpretation on review. This "well-settled" principle requires us to enforce contracts "based on the intent of the parties, the express terms of the

contract, surrounding circumstances and the underlying purpose of the contract." JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 160 (App. Div. 2022) (quoting In re Cnty. of Atl., 230 N.J. 237, 253 (2017)).  Terms used by contracting parties should be given their "plain and ordinary meaning."  Ibid. (quoting M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'"  Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)).  The task of the court "is simply interpretative"; the court is not to "rewrite a contract for the parties better than or different from the one they wrote themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Defendants' consistent claims that this dispute raises issues of fact arising out of the contracts between the parties is belied by the record.

Breach of Contract

Contract interpretation is a question of law.  Shields v. Ramslee Motors, 240 N.J. 279, 487 (2020); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 4:46-2 ("An issue regarding interpretation of a contract

clause presents a purely legal question that is particularly suitable for decision on a motion for summary judgment.").

Defendants argue that a jury should have determined if the landlord had materially breached the lease by suing defendants for common-area maintenance charges and real-estate tax, increasing the base rent four months earlier than allowed for by the terms of the Sports Medicine lease, imposing unreasonable late fees in violation of the late fee provision in the leases, and failing to remedy on-site issues with the elevator, HVAC, water penetration, and power outages.

The trial court found that the only provision in the leases that could potentially support the allegation that plaintiff had breached the leases was paragraph 27, which stated that "[t]enant shall be responsible for the payment of its pro-rata share of the increase in Common Area Maintenance (CAM) charges over the 2019 base year." These charges "shall be added to and become payable as "additional Rent with the installment of Base Rent next due or within thirty (30) days of demand []." However, the court reasoned, "[t]he testimony was clear that the reconciliation statement was not necessary because the plaintiff was not asking for the CAM charges." Therefore, "there was no breach of contract[,] and it was not a material breach." We agree.

Defendants' legal arguments as to plaintiff's alleged breach are not supported by any facts in the record. Defendants fail to point to a specific provision of the leases that constituted a breach of contract by plaintiff that would excuse defendants' non-performance. Instead, defendants rely on Russonella's trial testimony that there were issues with the elevator, HVAC system, water penetration, and power outages to justify nonpayment. However, it is undisputed that defendants did not notify plaintiff in writing about these alleged conditions prior to defendants' breach for non-payment and were not the reasons defendants gave when they sought renegotiation of the lease. Because the leases expressly required written notice and Russonella conceded under oath that defendants had never provided that notice, his assertions regarding plaintiff's alleged breaches cannot withstand a directed verdict.

For these reasons, we agree with the trial court's finding that defendants had failed to prove plaintiff breached the contracts in a manner that could have excused defendants' performance, and the issue did not need to be submitted to the jury.

Impossibility or Impracticability

"Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence

13

of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981).

"A successful defense of impossibility (or impracticability) of performance excuses a party from having to perform its contractual obligations, where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties." JB Pool Mgmt, LLC v. Four Seasons at Smithville Homeowners Ass'n Inc., 431 N.J. Super. 233, 246 (App. Div. 2013). Notably, the doctrine of impossibility is typically not applicable when the inability results from market shifts of financial inability. Restatement (Second) of Contracts § 261 cmt. b (Am. L. Inst. 1981). Defendants argue that "the jury should have determined whether the impossibility/impracticability defense existed for the performance of the Wellness Lease . . . " because of the effects of the COVID-19 pandemic.

We agree with the trial court that impossibility did not apply because the State did not require defendants to close their offices during the pandemic. In fact, Executive Order 107 permitted healthcare facilities to continue operations.

A-0461-23

See Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020). Russonella failed to show that defendants lost patients because of COVID-19. Rather, Russonella testified his practice was a new operation that he had begun just before the onset of the pandemic, the office was open throughout a substantial portion of the pandemic, and he continued to pay his employees even when the office had to close. The trial court concluded that "there was no testimony that [Russonella] ever had any patients and the [c]ourt's decision is [he] has not established impossibility by COVID . . . ." We endorse the trial court's reliance on Sullivan v. Max Spann Real Estate and Auction, in that "[t]he defense of impossibility does not include instances 'where the difficulty is the personal inability of the promisor to perform.'" 465 N.J. Super. 243, 264 (App. Div. 2020) (quoting Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div. 1992)). "[A] party cannot render contract performance legally impossible by its own actions." Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 303 (App. Div. 2013) (citing Creek Ranch, Inc. v. N.J. Tpk. Auth., 75 N.J. 421, 432 (1978)).

Because defendants' arguments were not supported factually by any documentary evidence and contradicted by Russonella's testimony, there was no question to present to the jury at the close of defendants' case.

15

<u>Late Fees</u>

"Generally, a lease is enforced 'as it is written, absent some superior contravening public policy.'" <u>175 Exec. House, LLC v. Miles</u>, 449 N.J. Super. 197, 202 (App. Div. 2017) (quoting <u>Hous. Auth. & Urban Redev. Agency v. Taylor</u>, 171 N.J. 580, 586 (2002)). Parties "are free to define the terms of the lease agreement" and, therefore, may classify costs such as late fees, attorneys' fees and damages as "additional rent." <u>Taylor</u>, 171 N.J. at 586; <u>see also</u> <u>Cmty. Realty Mgmt., Inc. for Wrightstown Arms Apartments v. Harris</u>, 155 N.J. 212, 234 (1998).

In commercial contracts between "sophisticated parties," liquidated-damages provisions such as late fees in a commercial lease are considered "presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." <u>MetLife Cap. Fin. Corp. v. Wash. Ave. Assocs. L.P</u>, 159 N.J. 484, 495 (1999). The purpose of these provisions is " not to compel the promisor to perform, but to compensate the promisee for non-performance." <u>Wasserman's Inc. v. Twp. of Middletown</u>, 137 N.J. 238, 253 (1994). The party challenging the provision "must establish that its application amounts to a penalty." <u>Id.</u> at 254. A clause imposing late fees will be

unreasonable if "it does more than compensate plaintiffs for their approximate actual damages caused by the breach." Ibid.

Defendants argue that the late fees should not be applied because they were imposed by plaintiff in an unreasonable and punitive manner. Specifically, defendants argue a jury should decide: (1) if this was a failure to pay situation, where no late fees should be imposed, or if this was an incentive to pay situation where late fees may be imposed; (2) if the late-fee provision was applied as a penalty and if the fees should not be applied in one or more months based on the terms of the lease; and (3) if the compounding late fee was unreasonable under the circumstances.

We disagree. Defendants rely on Fanarjian v. Moskowitz, 237 N.J. Super. 395 (App. Div. 1989), and claim that "as a matter of contract law, if no delinquent payments were made in a particular month, then no late fees are to be imposed for that month." Finally, defendants argue that if a lease agreement calls for the reassessing or compounding of late fees, then it must be reasonable under the circumstances, which defendants argue was an issue for a jury to decide.

Here, the language of the leases is clear. Defendants agreed to pay "five (5%) percent of any installment of Fixed Basic Rent or Additional Rent due paid

more than five (5) days after the due date thereof, to cover the extra expense involved in handling delinquent payments." Both leases specify "Late Charges are Additional Rent." Further, the leases plainly state that "[t]he amount of the Late Charge to be paid by Lessee shall be reassessed and <u>added to the Lessee's obligations for each successive monthly period until paid</u>." (Emphasis added). The clear language of the contract between the parties dictates that the outstanding late charges shall be compounded and added to the following months base rent if it remains unpaid. This language negates defendants' arguments that no late fee shall be imposed if there is no delinquent payment and that the compounding late fees must have been reasonable. It is clear from the terms of the leases that this was the arrangement to which the parties agreed.

Because the language of the lease agreements is clear, it is unnecessary to undertake a <u>Fanarjian</u> analysis. Moreover, <u>Fanarjian</u> is distinguishable because the court found it to be a failure-to-pay circumstance, where late fees could not be imposed. <u>Ibid.</u> Defendants, unlike the defendant in <u>Fanarjian</u>, remained in possession of the premises, and the court properly found that the language of the leases and actions by the parties warranted an imposition of late fees.

In addition, in <u>MetLife</u>, our Supreme Court concluded that a five-percent late charge in a commercial loan agreement between "sophisticated parties" was

reasonable, noting that both parties were represented by counsel, had an opportunity to fully negotiate the terms, and the charge aligned with the industry standards and was designed to compensate for costs associated with delinquent payments. 159 N.J. at 496-500.

Though Russonella testified that he did not remember if he was represented by counsel when he signed the leases and that he had "read some of" the terms of the leases before he signed them, he testified that he understood the language of the leases as including late charges as additional rent. He testified on multiple occasions that he was communicating with plaintiff through his attorneys. Additionally, he signed the leases on behalf of commercial business entities, giving rise to a presumption of reasonableness. See Mony Life Ins. Co. v. Paramus Parkway Bdg., Ltd., 364 N.J. Super. 92, 106 (App. Div. 2003) ("It is settled that a stipulated damages clause, such as [] providing [] for contractual default interest and a prepayment fee, negotiated between sophisticated commercial entities, is presumptively reasonable."). The court correctly determined defendants had failed to present any evidence to overcome this presumption of reasonableness.

In addition, defendants failed to present any evidence that the five-percent late charge was unreasonable. See Westmark Com. Mortg. Fund IV v. Teenform

Assocs., L.P., 362 N.J. Super. 336, 341 (App. Div. 2003) (a five-percent late fee was generally not a large or unreasonable fee in a commercial transaction). As the trial court noted in its ruling, there was "no testimony in this case that these late charges [were] unconscionable[,]" nor was there any testimony that "the State of New Jersey prohibits these types of late charges as unconscionable."

In sum, our review of the record supports the trial court's determination that defendants did not present evidence at trial to show that "reasonable minds could differ" to survive plaintiff's motion for a directed verdict. Having applied that standard on appeal, we agree with the trial court's order granting plaintiff's motion for a directed verdict and, accordingly, affirm the September 19, 2023 judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division